# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

MARGARET KIRCHMAN, et al.,

     Plaintiffs,

      v.                              Case No.: 8:06-cv-1787-T-24-TBM

NOVARTIS PHARMACEUTICALS
CORPORATION,

     Defendant.

_____/

## ORDER

    This cause comes before the Court on the Defendant Novartis Pharmaceuticals Corporation's *Daubert* Motion to Exclude Causation Testimony of Plaintiff's Case-Specific Expert Witnesses (Dkt. 29), which Plaintiff Margaret Kirchman opposes (Dkt. 39). Plaintiff also filed a Declaration from John Vecchione, with attachments in support of Plaintiff's opposition to Novartis' *Daubert* Motion to Exclude Plaintiff's Case-Specific Expert Witnesses. (Dkt. 38.) The Court conducted a hearing on the motion on May 15, 2014.

## I.    BACKGROUND

### A.   Facts

#### 1.    *2002-2003: Multiple Myeloma Diagnosis and Aredia and Zometa*

    Around January 2002, Donald Kirchman, who was 67 years old, was diagnosed with multiple myeloma by his oncologist, Dr. Sung Tae Byun. To slow the progression of multiple myeloma and decrease the risk of skeletal related events, Dr. Byun prescribed Aredia and Zometa, which are bisphosphonate drugs manufactured by Novartis. (Byun depo. 66, 73.) Mr. Kirchman received Aredia in January 2002, and was switched to Zometa in April 2002. He received Zometa until December 2003, when it was discontinued by Dr. Byun due to Mr. Kirchman's renal

insufficiency.  (*Id.* at 95-99.)  At the time he prescribed Aredia and Zometa to Mr. Kirchman in

2002 and 2003, Dr. Byun was unaware of any risk of osteonecrosis of the jaw ("ONJ") associated

with the drugs.

### 2.      *2003-2006: Dental History*

During an August 18, 2003 visit, Dr. Byun noted that Mr. Kirchman reported removing his

own tooth approximately two months prior and still felt draining from the hole in his gingiva.

(Byun depo. 92-93; Dkt. 39 at 12.)  Dr. Byun saw that Mr. Kirchman had drainage, noted a tooth

abscess, and prescribed antibiotics.  (Byun depo. 92-93.)  Dr. Byun recalled that Mr. Kirchman

had removed the tooth because it was loose.  (*Id.*)  Mrs. Kirchman testified:

> I remember [Mr. Kirchman] in Dr. Byun's office telling him "I was brushing my
> teeth and a tooth fell out."  That's when I started—I guess the only word is
> "badgering" him to go to the dentist.  I said, "because your teeth shouldn't just fall
> out."

(Mrs. Kirchman depo. 90-91.)[1]

On April 14, 2004, Mr. Kirchman visited Dr. Sabina Kunis, a general dentist, because of

pain and swelling in his mouth; this was Mr. Kirchman's first dentist visit since 1994.  (Dkt. 39 at

10.)  Dr. Kunis saw an infection and swelling in Mr. Kirchman's mouth.  (Kunis depo. 41.)

Although she hoped to have dentures made, Dr. Kunis believed Mr. Kirchman had hopeless teeth

that needed to be extracted first.  (*Id.* at 39-43.)  Specifically, she believed tooth # 8, which had an

abscess, needed to be extracted. (*Id.*)  She also marked multiple teeth in the upper jaw (tooth #2,

#6 through 12, and #14) as root tips, *i.e.,* they were broken inside the bone and only pieces of roots

remained.  (*Id.*)  Dr. Kunis referred Mr. Kirchman to Dr. Anthony Auletta, an oral surgeon, for

any necessary extractions.

---

[1] However, Mrs. Kirchman did not specify in her deposition whether—and the record is not clear that—
this was the same tooth that Mr. Kirchman told Dr. Byun about during his August 18, 2003 visit.

On April 23, 2004, Mr. Kirchman visited Dr. Auletta for an initial consultation. (Auletta depo. 49.) Dr. Auletta found multiple teeth were missing and the majority of the upper jaw teeth were fractured; his assessment regarding extractions did not differ from Dr. Kunis'. (*Id.* at 53-54, 59.) On May 3, 2004, Dr. Auletta extracted tooth #8. (*Id.* at 63-64.) On May 26, 2004, Dr. Auletta extracted multiple teeth in the upper and lower jaws, ultimately leaving Mr. Kirchman with no teeth on the top and four teeth on the bottom. (*Id.* at 65-68.)

During the surgery, Dr. Auletta biopsied Mr. Kirchman's bone in the left maxilla because the bone did not appear normal (*id.* at 69-70); found a "dehiscence of approximately 20 millimeter extending into the left maxillary antrum" (*id.* at 71); and found evidence of "chronic osteomyelitis" in the areas of tooth #7 and tooth #8, and in the left maxillary antrum (*id.* at 72-74, 94). The pathology report for the biopsies indicated to Dr. Auletta that the bone was infected and not living. (*Id.* at 86.)

On July 23, 2004, Dr. Auletta saw exposed bone around teeth #8 and #9. (*Id.* at 98.) On August 23, 2004, Dr. Auletta performed a procedure to remove visible dead bone in the area around tooth #6 through #11; he saw exposed bone around tooth #2 as well as tooth #8 and tooth #9. (*Id.* at 99-101.)

On October 28, 2004, Dr. Auletta noted that Mr. Kirchman "may be displaying one of the adverse reactions of osteonecrosis/osteomyelitis." (*Id.* at 110, 161.) At this point, Dr. Auletta had not reached a conclusion as to what caused Mr. Kirchman's condition but began suspecting it was related to Mr. Kirchman's prior use of bisphosphonates. (*Id.* at 110.) Dr. Auletta referred Mr. Kirchman to Dr. Benjamin Schaffer for hyperbaric oxygen therapy ("HBO"), a traditional treatment for osteomyelitis. (*Id.* at 109-11.)

During a November 1, 2004 visit with Dr. Byun, Mr. Kirchman reported "he has osteonecrosis of the maxilla and has seen Dr. Auletta and is also scheduled to see a specialist about the possible [HBO] therapy." (Byun depo. 153.)

On November 13, 2004, Dr. Auletta attended Dr. Robert Marx's seminar on bisphosphonate related osteonecrosis of the jaw ("BRONJ"). (Auletta depo. 15.) On November 29, 2004, Mr. Kirchman saw Dr. Auletta, who performed a debridement and alveoplasty in the area around teeth #2 and #8. (*Id*. at 114-15.)

During a January 28, 2005 visit, Dr. Auletta saw a bump in Mr. Kirchman's lower jaw. (*Id*. at 117.) When asked to explain why the notes for this visit state that he "explained that bisphosphonates caused the problem," Dr. Auletta testified that it was likely because "somewhere following my November meeting, [he] began to believe that [he] was putting the pieces together of possibly a patient that has BRONJ" and "so [he] was passing that information on to the patient because now we were . . . starting to see some signs on the lower jaw and I was trying put everything together." (*Id*. at 118.)

On May 20, 2005, Dr. Auletta prescribed Mr. Kirchman different antibiotics. (*Id*. at 120.) Dr. Auletta explained this was because "at that point some of the things I was doing was because we didn't have a lot of information, you know, I knew something wasn't one hundred percent right and so I was going to try something a little different and see if we could change his regiment." (*Id*.) When asked why his notes state, "no scheduled debridement of the mandible are planned at this time," Dr. Auletta testified that it was because he "probably felt it wasn't indicated at that time" and his treatment approach was changing as he was getting more information regarding the differences between treating patients with osteomyelitis and BRONJ. (*Id*. at 121-22.)

On April 26, 2006, Dr. Auletta examined Mr. Kirchman and reported that there was no exposed bone.  (*Id*. at 124.)

### 3.  *2007-2008: Multiple Myeloma Diagnosis and Aredia Infusion*

In July 2007, Mr. Kirchman presented to Dr. Auletta with a mass in the left lower jaw. (Auletta depo. 136-38.)  An "examination of the mouth reveal[ed] a complete healing from the osteonecrosis, and there's no evidence of exposed bone."  (*Id*. at 160; *see also id*. at 127.)  Dr. Auletta biopsied the mass.

On August 8, 2007, Dr. Byun confirmed that the mass was positive for multiple myeloma. (Byun depo. 113-14.)  On October 1, 2007, Dr. Byun noted that he "talked about intervention with Zometa or Aredia," but that Mr. Kirchman "feels against this therapeutic intervention as [he] was diagnosed with osteonecrosis involving his left jaw in the past." (*Id*. at 143-44, 180; *see also id.* at 122.)

By March 24, 2008, Mr. Kirchman developed hypercalcemia of malignancy.  (*Id*. at 56.) Despite knowing the risk of ONJ, Dr. Byun recommended resuming Aredia or Zometa. (*Id*. at 121-22.)  After Dr. Byun discussed the risks and benefits of Aredia and Zometa with the Kirchmans, Mr. Kirchman declined Zometa but agreed to receive Aredia.  (*Id*. at 56, 122-23, 131-32, 161). Mr. Kirchman received one dose of Aredia.  Three weeks later, on April 18, 2008, he died from multiple myeloma.  (*Id*. at 161.)

At his December 2012 deposition, Dr. Byun testified that his current prescribing practice is to counsel patients, and provide patients with literature, on the risk of ONJ.  (*Id.* at 5.)  The provided literature regarding Zometa notes that patients must consult a dentist and fix teeth before going on Zometa.  (Dkt. 38-8.)

**B.** **Procedural History**

In September 2006, the Kirchmans brought this diversity action against Novartis, alleging that Novartis' manufacturing, labeling, marketing, selling, advertising, and distributing of Aredia and Zometa caused their injuries.   (Dkt. 1.)  The complaint seeks compensatory and punitive damages for six claims.

Count I is a strict liability claim, alleging that Aredia and Zometa are unreasonably dangerous for normal use due to the inadequate warning about the risk of developing ONJ.[2]  Count III is a negligent failure to warn claim, alleging that Novartis failed to adequately warn about the risks of ONJ associated with Aredia and Zometa, and failed to meet the standard of care set forth by various federal statutes and regulations, which proximately caused Mr. Kirchman's ONJ. Count V alleges that Novartis breached an implied warranty of merchantability.  Count VI alleges Mrs. Kirchman's loss of consortium.

Count II was a negligent manufacture claim, and Count IV was a breach of express warranty claim.  However, Plaintiff withdrew both claims at the May 15, 2014 hearing.

In November 2006, this action was transferred to a Multidistrict Litigation Court in the Middle District of Tennessee for consolidated pretrial proceedings with other similar actions brought against Novartis ("MDL court").  In 2013, this action was remanded back to this Court.

Novartis filed a *Daubert* motion to exclude specific causation testimony from Plaintiff's non-retained experts who treated Mr. Kirchman—Drs. Auletta, Byun, Kunis, Schaffer, Robert Geisler, and Patrick Mulroy[3]—and from Plaintiff's retained expert, Dr. Vishtasb Broumand.  (Dkt.

---

[2] Although Count I also alleges defective design and defective manufacture, Plaintiff stated at the May 15, 2014 hearing that Count I is a strict liability failure to warn claim.
[3] Dr. Geisler was Mr. Kirchman's radiologist; Dr. Mulroy was his primary care physician.  (Dkt. 29-6.)

29.)  Novartis contends such specific causation testimony is inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993).

## II.    LEGAL STANDARD

This Court performs "a gatekeeping role" regarding admissibility of expert testimony. *Daubert,* 509 U.S. at 597.  Under Rule of Evidence 702:

> [i]f scientific . . . knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The proponent of the expert testimony has the burden of showing, by a preponderance of the evidence, that the testimony satisfies each of the following prongs:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;  (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hendrix ex rel G.P. v. Evenflo Co.,* 609 F.3d 1183, 1994 (11th Cir. 2010).

## III.   DISCUSSION

### A.    <u>Drs. Byun, Kunis, Schaffer, Geisler, and Mulroy</u>

Novartis moves to exclude specific causation testimony from Drs. Byun, Kunis, Schaffer, Geisler, and Mulroy, arguing that they did not diagnose Mr. Kirchman with ONJ and are not qualified to testify as experts regarding the cause of Mr. Kirchman's alleged ONJ.   (Dkt. 29.)  In response, and at the May 15, 2014 hearing, Plaintiff stated that she will not offer specific causation testimony from these doctors. (Dkt. 39 at 4.)  Accordingly, Novartis' *Daubert* motion to exclude specific causation testimony from Drs. Byun, Kunis, Schaffer, Geisler, and Mulroy is **GRANTED**.

### B.   Dr. Anthony Auletta

Novartis moves to exclude specific causation testimony from Mr. Kirchman's oral surgeon, Dr. Auletta, arguing that he does not have sufficient expertise to offer an admissible opinion as to whether Aredia and/or Zometa medically caused Mr. Kirchman's alleged ONJ.  And even if Dr. Auletta was qualified to offer such an opinion, Novartis contends his causation testimony should be still be excluded because it is unreliable.  Specifically, Novartis contends Dr. Auletta initially diagnosed Mr. Kirchman with osteomyelitis and never definitively diagnosed Mr. Kirchman with BRONJ.  Rather, Dr. Auletta testified that he did not have enough information to make a definitive diagnosis and tentatively diagnosed Mr. Kirchman with BRONJ.  Further, Novartis contends Dr. Auletta's tentative diagnosis was not based on a scientifically reliable differential diagnosis, but was formed after he attended a seminar by Dr. Robert Marx on BRONJ.

In response, Plaintiff contends Dr. Auletta's knowledge and experience makes him qualified to testify as an expert on causation because: he is a board-certified oral and maxillofacial surgeon; is "an expert in dentistry and pathology of the jaw;" has treated osteomyelitis many times; is familiar with Aredia and Zometa; and "showed extreme familiarity with the differences between ONJ and BRONJ and Zometa and chemotherapy at his deposition."  (Dkt. 39 at 7-9.)  Further, Plaintiff asserts that that, during Dr. Auletta's treatment of Mr. Kirchman, Dr. Auletta's initial diagnosis of osteomyelitis was due to his lack of knowledge about BRONJ, but that he began "putting the pieces together" and stopped aggressive procedures to avoid worsening Mr. Kirchman's condition.  Plaintiff also asserts that "Dr. Auletta (as evidenced in his records and testimony) . . . performed a differential diagnosis."  (Dkt. 39 at 16-17.)

The Court finds that Plaintiff has failed to establish that Dr. Auletta is qualified to opine whether Aredia and/or Zometa caused Mr. Kirchman's ONJ.  During his deposition, Dr. Auletta testified that he is not an expert on bisphosphonates or BRONJ and that he is not qualified to opine as to the cause of Mr. Kirchman's ONJ.  (Auletta depo. 11, 147.)  Although Dr. Auletta is an oral surgeon with expertise in dentistry and pathology of the jaw, his experience, knowledge, and training does not render him qualified to testify as to whether Aredia and/or Zometa caused Mr. Kirchman's ONJ.

Moreover, Plaintiff simply asserts—without identifying records, testimony, or other evidence—that Dr. Auletta performed a valid differential diagnosis in Mr. Kirchman's case.  Although Plaintiff contends Dr. Auletta diagnosed Mr. Kirchman with BRONJ in October 2004 (Dkt. 39 at 6), the record shows Dr. Auletta had not conclusively diagnosed Mr. Kirchman with ONJ, let alone determined that it was caused by Aredia and/or Zometa.  *See* Auletta depo. 162 ("I was leaving all my options open in terms of a diagnosis with this gentlemen.  I just didn't have enough information in 2004.").  Further, when asked if he could offer an opinion with a reasonable degree of medical certainty as to what caused Mr. Kirchman's ONJ, Dr. Auletta did not answer affirmatively and instead stated that Mr. Kirchman had "the cofactors of IV bisphosphonate," oral surgery procedures, and "malignancy, specifically multiple myeloma."  (*Id*. at 147.)  Dr. Auletta's deposition testimony reveals no assessment as to what risk factors he ruled out as causes of Mr. Kirchman's ONJ, and what scientific methods and procedures were used to rule out those factors.

There is a distinction between diagnosing a medical condition and determining its cause.  *See Taylor v. Novartis Pharms. Corp.*, 2013 WL 85168, at * (S.D. Fla. Jan. 7, 2013) ("[C]ourts have recognized that there is a distinction between an expert being able to diagnose and/or treat a condition and [being qualified] to give an opinion regarding causation."); *Sheffer v. Novartis*

*Pharms. Corp.*, 2013 WL 5276558, at *3 (S.D. Ohio Sept. 18, 2013) (same).  No record evidence shows Dr. Auletta concluded that Aredia and/or Zometa caused Mr. Kirchman's ONJ.  Nor does the record show Dr. Auletta conducted a valid differential diagnosis in reaching any such conclusion.  Thus, Dr. Auletta may not testify as to the cause of Mr. Kirchman's ONJ.

Accordingly, Novartis' *Daubert* motion to exclude specific causation testimony from Dr. Auletta is **GRANTED**.  However, the Court notes that this ruling does not exclude Dr. Auletta from testifying as to matters other than causation, such as Mr. Kirchman's symptoms, tests, and treatment, or what Dr. Auletta did in response to Mr. Kirchman's condition and what he would have done differently, if anything, had he known of any additional warnings.  *See In re Aredia & Zometa Products Liab. Litig.*, 2009 WL 2496886, at *3 (M.D. Tenn. Aug. 13, 2009).

### C.    Dr. Vishtaub Broumand

Dr. Broumand is an oral and maxillofacial surgeon, who has been retained by plaintiffs in several Aredia and Zometa cases, including this one, to testify regarding causation.   Dr. Broumand's opinion is that Mr. Kirchman's use of Aredia and Zometa caused him to develop ONJ. *See* Dkt. 29-10 at 5 ("Mr. Kirchman's condition represents bisphosphonate-induced avascular osteonecrosis which is a known complication of nitrogen-containing IV bisphosphonates such as Aredia and Zometa.").  According to his October 3, 2013 expert report, and his November 15, 2013 deposition, Dr. Broumand reviewed Mr. Kirchman's medical and dental records, but did not review x-rays or personally examine Mr. Kirchman.

Novartis argues that Dr. Broumand should be excluded from testifying because he failed to use a reliable methodology to form his causation opinion and failed to reliably rule out osteomyelitis as a potential cause of Mr. Kirchman's ONJ.  Specifically, Novartis contends Dr. Broumand's conclusion—that Mr. Kirchman did not have osteomyelitis because his "condition continued to worsen" after treatment (including HBO), and because his jaw injury had "no

infectious etiology"—was unsupported by record evidence.  In response, Plaintiff argues that Dr. Broumand applied a scientifically and judicially acceptable methodology of differential diagnosis and excluded the following as causes of Mr. Kirchman's ONJ: osteomyelitis, multiple myeloma, hypertension, gout, anemia, colon polyps, smoking, and various drugs used to treat Mr. Kirchman's multiple myeloma.

As this Court noted in *Dopson-Troutt*, Novartis' attempts to exclude Dr. Broumand from testifying as to causation have been denied in other Aredia and Zometa cases.  *See Dopson-Troutt v. Novartis Pharms. Corp*., No. 06-cv-1708, Dkt. 105 (M.D. Fla. Mar. 14, 2013); *Taylor*, 2013 WL 85168, at \*6-7; *Chiles v. Novartis Pharms. Corp*., No. 3:06-cv-96, p. 13-14 (M.D. Fla. Feb. 7, 2013) (adopting the *Taylor* court's reasoning and findings to deny Novartis' *Daubert* motion to exclude Dr. Broumand).  The Court agrees with the reasoning and conclusions set forth in *Taylor*, where the court found "Dr. Broumand's differential diagnosis meets the Eleventh Circuit standard for admissibility because he both considered other potential causes of Plaintiff's ONJ and determined that Plaintiff's use of Aredia and Zometa was the likely cause."  2013 WL 85168, at \*7.  The *Taylor* court also ruled that any inconsistencies between Dr. Broumand's testimony and his expert report "[go] to the weight rather than the admissibility of his opinion."  *Id.*

The Court finds that Dr. Broumand conducted a proper differential diagnosis and that his causation opinion is sufficiently reliable under *Daubert*.  Any discrepancies in Dr. Broumand's expert report or deposition may be dealt with through cross-examination at trial.  Thus, Novartis' *Daubert* motion to exclude specific causation testimony from Dr. Broumand is **DENIED.**

IV.     **CONCLUSION**

Accordingly, it is **ORDERED and ADJUDGED** that Defendant's *Daubert* Motion to Exclude Causation Testimony of Plaintiff's Case-Specific Expert Witnesses (Dkt. 29) is **GRANTED IN PART AND DENIED IN PART**:  Defendant's motion is granted as to Drs. Auletta, Byun, Kunis, Schaffer, Geisler, and Mulroy, but denied as to Dr. Broumand.

**DONE AND ORDERED** at Tampa, Florida, this 23rd day of May, 2014.

SUSAN C. BUCKLEW
United States District Judge

Copies To: Counsel of Record

12