## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MARGARET KIRCHMAN, et al.,

      Plaintiffs,

      v.                                      Case No.: 8:06-cv-1787-T-24-TBM

NOVARTIS PHARMACEUTICALS
CORPORATION,

      Defendant.

_____/

## ORDER

      This cause comes before the Court on the Defendant Novartis Pharmaceuticals Corporation's Motion for Summary Judgment (Dkt. 32), which Plaintiff Margaret Kirchman opposes (Dkt. 40).  Plaintiff also filed a Declaration from John Vecchione, with attachments in support of Plaintiff's opposition to Novartis' Motion for Summary Judgment. (Dkt. 38.)  The Court conducted a hearing on the motion on May 15, 2014.

## I.      BACKGROUND

### A.      Facts

#### 1.      2002-2003: Multiple Myeloma Diagnosis and Aredia and Zometa

      Around January 2002, Donald Kirchman, who was 67 years old, was diagnosed with multiple myeloma by his oncologist, Dr. Sung Tae Byun.  To slow the progression of multiple myeloma and decrease the risk of skeletal related events, Dr. Byun prescribed Aredia and Zometa, which are bisphosphonate drugs manufactured by Novartis.  (Byun depo. 66, 73.)  Mr. Kirchman received Aredia in January 2002, and was switched to Zometa in April 2002.  He received Zometa until December 2003, when it was discontinued by Dr. Byun due to Mr. Kirchman's renal

insufficiency.  (*Id.* at 95-99.)  At the time he prescribed Aredia and Zometa to Mr. Kirchman in 2002 and 2003, Dr. Byun was unaware of any risk of osteonecrosis of the jaw ("ONJ") associated with the drugs.

### 1.    *2003-2006: Dental History*

During an August 18, 2003 visit, Dr. Byun noted that Mr. Kirchman reported removing his own tooth approximately two months prior and still felt draining from the hole in his gingiva. (Byun depo. 92-93.)  Dr. Byun saw that Mr. Kirchman had drainage, noted a tooth abscess, and prescribed antibiotics.  (*Id.*)  Dr. Byun recalled that Mr. Kirchman had removed the tooth because it was loose.  (*Id.*)  Mrs. Kirchman testified:

> I remember [Mr. Kirchman] in Dr. Byun's office telling him "I was brushing my teeth and a tooth fell out."  That's when I started—I guess the only word is "badgering" him to go to the dentist.  I said, "because your teeth shouldn't just fall out."

(Mrs. Kirchman depo. 90-91.)[1]

On April 14, 2004, Mr. Kirchman visited Dr. Sabina Kunis, a general dentist, because of pain and swelling in his mouth; this was Mr. Kirchman's first dentist visit since 1994.  Dr. Kunis saw an infection and swelling in Mr. Kirchman's mouth.  (Kunis depo. 41.)  Although she hoped to have dentures made, Dr. Kunis believed Mr. Kirchman had hopeless teeth that needed to be extracted first.  (*Id.* at 39-43.)  Specifically, she believed tooth # 8, which had an abscess, needed to be extracted. (*Id.*)  She also marked multiple teeth in the upper jaw (tooth #2, #6 through 12, and #14) as root tips, *i.e.,* they were broken inside the bone and only pieces of roots remained.  (*Id.*)  Dr. Kunis referred Mr. Kirchman to Dr. Anthony Auletta, an oral surgeon, for any necessary extractions.

---

[1] However, Mrs. Kirchman did not specify in her deposition whether—and the record is not clear that— this was the same tooth that Mr. Kirchman told Dr. Byun about during his August 18, 2003 visit.

On April 23, 2004, Mr. Kirchman visited Dr. Auletta for an initial consultation. (Auletta depo. 49.) Dr. Auletta found multiple teeth were missing and the majority of the upper jaw teeth were fractured; his assessment regarding extractions did not differ from Dr. Kunis'. (*Id.* at 53-54, 59.) On May 3, 2004, Dr. Auletta extracted tooth #8. (*Id.* at 63-64.) On May 26, 2004, Dr. Auletta extracted multiple teeth in the upper and lower jaws, ultimately leaving Mr. Kirchman with no teeth on the top and four teeth on the bottom. (*Id.* at 65-68.)

During the surgery, Dr. Auletta biopsied Mr. Kirchman's bone in the left maxilla because the bone did not appear normal (*id.* at 69-70); found a "dehiscence of approximately 20 millimeter extending into the left maxillary antrum" (*id.* at 71); and found evidence of "chronic osteomyelitis" in the areas of tooth #7 and tooth #8, and in the left maxillary antrum (*id.* at 72-74, 94). The pathology report for the biopsies indicated to Dr. Auletta that the bone was infected and not living. (*Id.* at 86.)

On July 23, 2004, Dr. Auletta saw exposed bone around teeth #8 and #9. (*Id.* at 98.) On August 23, 2004, Dr. Auletta performed a procedure to remove visible dead bone in the area around tooth #6 through #11; he saw exposed bone around tooth #2 as well as tooth #8 and tooth #9. (*Id.* at 99-101.)

On October 28, 2004, Dr. Auletta noted that Mr. Kirchman "may be displaying one of the adverse reactions of osteonecrosis/osteomyelitis." (*Id.* at 110, 161.) At this point, Dr. Auletta had not reached a conclusion as to what caused Mr. Kirchman's condition but began suspecting it was related to Mr. Kirchman's prior use of bisphosphonates. (*Id.* at 110.) Dr. Auletta referred Mr. Kirchman to Dr. Benjamin Schaffer for hyperbaric oxygen therapy ("HBO"), a traditional treatment for osteomyelitis. (*Id.* at 109-11.)

During a November 1, 2004 visit with Dr. Byun, Mr. Kirchman reported "he has osteonecrosis of the maxilla and has seen Dr. Auletta and is also scheduled to see a specialist about the possible [HBO] therapy." (Byun depo. 153.)

On November 13, 2004, Dr. Auletta attended Dr. Robert Marx's seminar on bisphosphonate related osteonecrosis of the jaw ("BRONJ"). (Auletta depo. 15.)   On November 29, 2004, Mr. Kirchman saw Dr. Auletta, who performed a debridement and alveoplasty in the area around teeth #2 and #8. (*Id*. at 114-15.)

During a January 28, 2005 visit, Dr. Auletta saw a bump in Mr. Kirchman's lower jaw. (*Id*. at 117.)   When asked to explain why the notes for this visit state that he "explained that bisphosphonates caused the problem," Dr. Auletta testified that it was likely because "somewhere following my November meeting, [he] began to believe that [he] was putting the pieces together of possibly a patient that has BRONJ" and "so [he] was passing that information on to the patient because now we were . . . starting to see some signs on the lower jaw and I was trying put everything together." (*Id*. at 118.)

On May 20, 2005, Dr. Auletta prescribed Mr. Kirchman different antibiotics. (*Id*. at 120.) Dr. Auletta explained this was because "at that point some of the things I was doing was because we didn't have a lot of information, you know, I knew something wasn't one hundred percent right and so I was going to try something a little different and see if we could change his regiment." (*Id*.) When asked why his notes state, "no scheduled debridement of the mandible are planned at this time," Dr. Auletta testified that it was because he "probably felt it wasn't indicated at that time" and his treatment approach was changing as he was getting more information regarding the differences between treating patients with osteomyelitis and BRONJ. (*Id*. at 121-22.)

On April 26, 2006, Dr. Auletta examined Mr. Kirchman and reported that there was no exposed bone.  (*Id*. at 124.)

### 2.    *2007-2008: Multiple Myeloma Diagnosis and Aredia Infusion*

In July 2007, Mr. Kirchman presented to Dr. Auletta with a mass in the left lower jaw. (Auletta depo. 136-38.)  An "examination of the mouth reveal[ed] a complete healing from the osteonecrosis, and there's no evidence of exposed bone."  (*Id*. at 160; *see also id*. at 127.)  Dr. Auletta biopsied the mass.

On August 8, 2007, Dr. Byun confirmed that the mass was positive for multiple myeloma. (Byun depo. 113-14.)  On October 1, 2007, Dr. Byun noted that he "talked about intervention with Zometa or Aredia," but that Mr. Kirchman "feels against this therapeutic intervention as [he] was diagnosed with osteonecrosis involving his left jaw in the past." (*Id*. at 143-44, 180; *see also id.* at 122.)

By March 24, 2008, Mr. Kirchman developed hypercalcemia of malignancy.  (*Id*. at 56.) Despite knowing the risk of ONJ, Dr. Byun recommended resuming Aredia or Zometa. (*Id*. at 12122.)  After Dr. Byun discussed the risks and benefits of Aredia and Zometa with the Kirchmans, Mr. Kirchman declined Zometa but agreed to receive Aredia.  (*Id*. at 56, 122-23, 131-32, 161). Mr. Kirchman received one dose of Aredia.  Three weeks later, on April 18, 2008, he died from multiple myeloma.  (*Id*. at 161.)

At his December 2012 deposition, Dr. Byun testified that his current prescribing practice is to counsel patients, and provide patients with literature, on the risk of ONJ.  (*Id.* at 5.)  The provided literature regarding Zometa notes that patients must consult a dentist and fix teeth before going on Zometa.  (Dkt. 38-8.)

**B.** **Procedural History**

In September 2006, the Kirchmans brought this diversity action against Novartis, alleging that Novartis' manufacturing, labeling, marketing, selling, advertising, and distributing of Aredia and Zometa caused their injuries. (Dkt. 1.) The complaint seeks compensatory and punitive damages for six claims. Count I is a strict liability claim, alleging that Aredia and Zometa are unreasonably dangerous for normal use due to the inadequate warning about the risk of developing ONJ.[2] Count III is a negligent failure to warn claim, alleging that Novartis failed to adequately warn about the risks of ONJ associated with Aredia and Zometa, and failed to meet the standard of care set forth by various federal statutes and regulations, which proximately caused Mr. Kirchman's ONJ. Count V alleges that Novartis breached an implied warranty of merchantability. Count VI alleges Mrs. Kirchman's loss of consortium.

Count II was a negligent manufacture claim, and Count IV was a breach of express warranty claim. However, Plaintiff withdrew both claims at the May 15, 2014 hearing.

In November 2006, this action was transferred to a Multidistrict Litigation Court in the Middle District of Tennessee for consolidated pretrial proceedings with other actions brought against Novartis ("MDL court"). In 2013, this action was remanded back to this Court.

In its motion, Novartis argues that summary judgment should be granted in its favor: (1) on all claims because there is no evidence of medical causation; (2) on the failure-to-warn claims because there is no evidence that inadequate warnings were a proximate cause of Mr. Kirchman's injuries; (3) on the breach of implied warranty claim because there is no evidence of privity; and (4) on the loss of consortium claim because all underlying claims fail. (Dkt. 32.)

---

[2] Although Count I also alleges defective design and defective manufacture, Plaintiff stated at the May 15, 2014 hearing that Count I is a strict liability failure to warn claim.

## II.      LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *See Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *See id.* When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings and, by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.

## III.     DISCUSSION

### A.      All Claims: Specific Medical Causation

Novartis argues summary judgment should be granted in its favor on all claims because Plaintiff has no admissible expert testimony showing that Aredia and/or Zometa caused Mr. Kirchman to develop ONJ. (Dkt. 32 at 11.) This argument, however, is foreclosed by the Court's denial of Novartis' *Daubert* motion to exclude Dr. Broumand's opinion as to medical causation. (Dkt. 67.) Accordingly, Novartis' motion for summary judgment on this basis is **DENIED**.

### B.      Count I and Count III: Proximate Cause

Novartis moves for summary judgment as to Count I and Count III, arguing that the allegedly inadequate warnings did not proximately cause Mr. Kirchman's ONJ. Novartis contends that Dr. Byun would have still prescribed Aredia and/or Zometa to Mr. Kirchman in 2002 and 2003 even if he had been adequately warned, given: (1) Dr. Byun testified that he would not have changed his recommendations or treatment of Mr. Kirchman even if he had received different

warnings; (2) Dr. Byun testified that Aredia and Zometa were the "standard of care" therapy for multiple myeloma patients in 2002 and 2003 and remains the standard today; and (3) Dr. Byun prescribed Aredia to Mr. Kirchman in March 2008, after different warnings were provided. (Dkt. 32 at 4-7.)   Novartis further asserts that even if Dr. Byun had changed his prescribing practice— by warning Mr. Kirchman about ONJ—it would not have changed Mr. Kirchman's injuries. (Dkt. 32 at 7-8.)   Specifically, Novartis contends there is no evidence that Mr. Kirchman would have declined Aredia and Zometa in 2002 and 2003 had Dr. Byun told him about the risk of ONJ.

In response, Plaintiff asserts that Dr. Byun's prescribing decision does not control the proximate cause issue.  (Dkt. 40 at 15.)  Plaintiff cites to *Guenther*, where Judge Presnell ruled that proximate cause did not turn solely on the oncologist's decision to prescribe the drugs but also required considering what the patient would have done:

> I think that had there been adequate warnings, just to use the inferences in plaintiffs' favor, these oncologists would have . . . provided additional risk information to Miss Guenther. And according to her testimony, she would have declined Zometa infusion.  And I think that's the proper analysis.  I don't think you can take the plaintiff out of the equation and say just because the oncologist would have still recommended it, that that answers the question.  It doesn't, I don't think, answer the ultimate question of causation.

(Dkt. 40 at 9) (quoting Trial Tr., *Guenther* v. *Novartis Pharms. Corp.*, 6:08-cv-456, (M.D. Fla. Sept. 19, 2013)).   Plaintiff argues that Dr. Byun and Mr. Kirchman, working together and adequately warned, would not have used the drugs in the same manner.  (Dkt. 40 at 12-13.) Plaintiff contends Dr. Byun changed his practice after learning about the risk of ONJ—*e.g.,* he now counsels patients and provides them literature on the risk of ONJ; and he told Mr. Kirchman about the risk of ONJ during their discussions about resuming bisphosphonate treatment in 2007 and 2008.  Plaintiff contends Mr. Kirchman, in turn, would have not taken Aredia and/or Zometa in 2002 and 2003 had he been adequately warned.

In order to prevail on a failure to warn claim under strict liability or negligence, Plaintiff must prove that the warnings to the prescribing physician were inadequate,[3] and that the inadequate warnings proximately caused Mr. Kirchman's injury. *Hoffmann-La Roche Inc. v. Mason*, 27 So. 3d 75, 77 (Fla. 1st DCA 2009). Plaintiff establishes proximate cause by showing that the inadequacy of the warnings was a substantial factor in bringing about Mr. Kirchman's injury. *Id.* (citing *Colville v. Pharmacia & Upjohn Co. LLC*, 565 F. Supp. 2d 1314, 1322 (N.D. Fla. 2008).

The Court concludes that genuine issues of material fact exist as to whether the allegedly inadequate warning was a proximate cause of Mr. Kirchman's ONJ. While Dr. Byun testified that a different warning would not have changed his decision to prescribe Aredia and/or Zometa to Mr. Kirchman, Dr. Byun also testified that he now discusses the risk of ONJ with his patients, and did discuss that risk with Mr. Kirchman when recommending that he take Aredia and/or Zometa in 2007 and 2008. Thus, a reasonable juror could find that Dr. Byun, had he been adequately warned, would have changed his prescribing practices by giving different warnings or instructions to Mr. Kirchman in 2002 and 2003. *See, e.g., Guenther v. Novartis Pharms. Corp.*, 2014 WL 657919, at *2-3, (M.D. Fla. Feb. 20, 2014) (denying Rule 50(a) motion on proximate cause issue under Florida law where there was sufficient evidence that a different warning could have prevented the plaintiff's injury by "prompting the physician to pass along a more detailed warning"); *Toole v. McClintock*, 999 F.2d 1430, 1433 (11th Cir. 1993) (in affirming the denial of directed verdict, applying Alabama's learned intermediary doctrine and finding that "a different warning . . . would

---

[3] In a prescription drug case, "the duty of a drug manufacturer to warn of the dangers involved in the use of a drug is satisfied if it gives an adequate warning to the physician who prescribes the drug." *Hoffmann-La Roche Inc. v. Mason*, 27 So. 3d 75, 77 (Fla. 1st DCA 2009). This is because under the "learned intermediary" doctrine, a prescription drug manufacturer has a duty to warn the physician, not the patient, of a drug's dangerous side effects. *Felix v. Hoffmann-LaRoche, Inc.*, 540 So. 2d 102, 104 (Fla. 1989).

have caused [the physician] to behave differently" where a reasonable juror could conclude that "a different warning would have caused [the physician] to warn [the patient]").

Further, Mr. Kirchman declined Aredia and Zometa in October 2007 due to the risk of ONJ, and did not take Zometa in March 2008.  On this record, a reasonable juror could infer that Mr. Kirchman, had he been given different warnings or instructions, would have declined Aredia and/or Zometa in 2002 and 2003.  *See, e.g., Guenther v. Novartis Pharms. Corp.*, 2013 WL 1498162, at *2 (M.D. Fla. Apr. 9, 2013) (denying summary judgment as to proximate cause where the patient "testified that if she had been warned by her oncologists about the risk of ONJ, she would have refused to take Zometa, and that she did stop taking the drug once she was told of that risk."); *Dopson-Troutt v. Novartis Pharms. Corp.*, 2013 WL 1344732, at *4 (M.D. Fla. Apr. 2, 2013) (denying summary judgment as to proximate cause where the plaintiff "testified that she would not have continued taking the drugs if she had been adequately warned about their risks"); *Munroe v. Barr Labs., Inc.*, 670 F. Supp. 2d 1299, 1305 (N.D. Fla. 2009) (holding that Florida's learned intermediary doctrine did not entitle the drug manufacturer to summary judgment where a juror could infer that a better warning would have changed the physician's instructions to the patient, and the patient would have heeded the instructions).  Accordingly, Novartis' motion for summary judgment on the proximate cause issue is **DENIED**.

## C.    Breach of Implied Warranty

Novartis argues that it is entitled to summary judgment on Plaintiff's breach of implied warranty claim, because Mr. Kirchman was not in privity with Novartis.  (Dkt. 32 at 9-10.) Plaintiff's response does not address this argument.  (Dkt. 40.)

Under Florida law, the plaintiff must be in privity of contract to recover for a breach of implied warranty. *See Kramer v. Piper Aircraft Corp.*, 520 So. 2d 37, 39 (Fla. 1988) ("[T]he implied warranty claim for personal injury no longer exists under Florida law absent privity."). "A

plaintiff who purchases a product but does not buy it directly from the defendant, is not in privity with that defendant." *Fields v. Mylan Pharm., Inc.*, 751 F. Supp. 2d 1257, 1259 (N.D. Fla. 2009) (citation and quotation marks omitted).

Here, Plaintiff has provided no evidence that Mr. Kirchman purchased Aredia and Zometa directly from Novartis. Due to the absence of privity, Plaintiff's breach of implied warranty claim fails. *See id.* (dismissing breach of warranty claim where "Plaintiff's complaint does not allege that Plaintiff purchased the prescription drug directly from Defendants or that he contracted with Defendants"); *Guenther*, 2013 WL 1498162, at *4; *Bailey v. Monaco Coach Corp.*, 168 Fed. Appx. 893, 895 n.1 (11th Cir. 2006) (finding "[n]o privity exists between Baily and Monaco" because "Bailey purchased the motor home from a dealer and not directly from Monaco"). Accordingly, Novartis's motion for summary judgment is **GRANTED** as to Count V.

### D.   Count VI: Loss of Consortium

Novartis argues that because it is entitled to summary judgment on Plaintiff's loss of consortium claim because all of the underlying claims fail. However, because some of the underlying claims have survived summary judgment, Novartis' summary judgment motion is **DENIED** as to Count VI.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Dkt. 32) is **GRANTED IN PART AND DENIED IN PART**. Defendant's motion is granted as to Count V, and the motion is otherwise denied.

**DONE AND ORDERED** at Tampa, Florida, this 23rd day of May, 2014.

*Susan C. Bucklew*

SUSAN C. BUCKLEW
United States District Judge

Copies To: Counsel of Record